# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | : | |
| ANTHONY R. SPAY, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  09-4672 |
| | : | |
| CVS CAREMARK CORPORATION; | : | |
| CAREMARK Rx, LLC (f/k/a CAREMARK | : | |
| Rx, Inc.); CAREMARK, LLC (f/k/a | : | |
| CAREMARK, INC.); SILVERSCRIPT, LLC | : | |
| (f/k/a SILVERSCRIPT INC.), | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                                                August 27, 2013

Currently pending before the Court is a Motion to Compel by Plaintiff/Relator Anthony

R. Spay.  For the following reasons, the Motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The present litigation is an action to recover damages and civil penalties on behalf of the

United States of America arising from false and/or fraudulent records, statements, and claims

made, used, and caused to be made, used, or presented by Defendants CVS Caremark

Corporation, Caremark Rx, LLC (f/k/a Caremark Rx, Inc.), Caremark, LLC (f/k/a Caremark,

Inc.), and Silverscript, LLC (f/k/a/ Silverscript, Inc.) (collectively "Defendants").  (Am. Compl. ¶

1.)  At the core of the Amended Complaint, filed on August 5, 2011, is the allegation that

Defendants violated the False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), in their role as a

Pharmacy Benefit Manager ("PBM"), by engaging in a nationwide practice of fraudulently

adjudicating and submitting improper Prescription Drug Event ("PDE") claims to the Center for

Medicaid and Medicare Services ("CMS") under the Part D Program.  Plaintiff also alleges that

Defendants violated the FCA by falsely certifying that the PDE data submitted to CMS was

truthful, accurate and complete.

Following the initiation of suit, Defendants moved to dismiss the Amended Complaint on

a multitude of grounds.  Upon thorough consideration of the parties' extensive briefing, the Court

issued an opinion denying the Motion in its entirety and allowing all claims to proceed.[1]

On March 29, 2013, Plaintiff served on Defendants his First Set of Requests for the

Production of Documents containing sixty separate Requests.  Defendants subsequently

responded with a forty-two page series of responses and objections.  Upon receipt of Defendants'

submission, Plaintiff sent a letter to Defendants, dated May 13, 2013, outlining perceived

deficiencies in their production.  During a June 4, 2013 teleconference, Defendants declined to

withdraw their objections, but agreed to expand the time frame for their production to include

documents from January 1, 2006 to January 1, 2008.  The parties met again on June 13, 2013,

regarding the formatting and schedule of document production, after which Defendants began

producing limited documents on a rolling basis.

Plaintiff filed the current Motion to Compel on July 2, 2013.  Defendants responded on

---

[1]  In an effort to avoid repetition, the Court incorporates by reference the lengthy
summary of the allegations in the Amended Complaint set forth in the Memorandum of
December 20, 2012.  U.S. ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125 (E.D. Pa.
2012).

July 19, 2013, Plaintiff filed a Reply Brief on August 2, 2013, and Defendants filed a Sur-reply on August 9, 2013. The Motion is now ripe for consideration.

## II.  DISCUSSION[2]

Currently at issue between the parties is the permissible scope of discovery on to Plaintiff's FCA claims, which this Court deemed sufficient to survive Rule 12(b)(6) scrutiny. The parties currently maintain a dispute on six issues: (1) the temporal scope of all discovery; (2) the substantive scope of discovery on the "nationwide" FCA claims; (3) the geographic scope of "nationwide" FCA discovery; (4) whether Defendants must respond to certain individual topic areas for which they have declined to produce responsive documents; (5) whether Defendants must withdraw their confidentiality objections; and (6) whether Defendants must withdraw their objections to the definitions of certain industry terms. The Court will address each issue individually.

### A.  <u>Temporal Scope of All Discovery</u>

The first area of dispute between the parties is whether Plaintiff has sufficiently alleged continuing fraud in order to rationalize its request for discovery from 2006 to the present. While agreeing to produce documents for the entire time period of the contract between Medical Card Systems ("MCS"), a Part D Sponsor, and Defendant SilverScript—from January 1, 2006 to January 1, 2008—Defendants have refused to produce any documents beyond that time frame.

Plaintiff attempts to justify his requests for documents beyond this time period on the ground that the First Amended Complaint alleges that Defendants' fraudulent practices were

---

[2] In the interests of brevity, the Court will forego any discussion of the well-known and well-established discovery standards and will limit citation to case law only to instances where it is essential to the ruling.

carried out on an ongoing basis with respect to Defendants' contracts with Part D Sponsors nationwide. He notes that the Court, in denying the Motion to Dismiss, permitted the nationwide claims to proceed. Further, he argues that a defendant who engages in continued fraudulent behavior should not be entitled to escape liability for behavior that exceeds the bounds set forth in the complaint.

Contrary to Plaintiff's position, however, the Court does not find that Plaintiff's allegations justify allowing discovery to span for more than seven years, from 2006 to the present. First, and perhaps most importantly, the Amended Complaint's allegations of continuing misconduct are superficial at best and comprise only three paragraphs of the 382-paragraph Complaint. Paragraphs 2 and 3 assert that Defendants "have intentionally, *systematically*, recklessly and illegally provided false of fraudulent Medicare Part D claims and prescription drug event ("PDE") data to the Centers for Medicare and Medicaid Services ("CMS") since 2006," and that "[a]s a direct result of Defendants' fraudulent, improper practices, Federal health insurance programs including, but not limited to, Medicare Part D, have been caused *and continue to*" pay out on false of fraudulent claims. (Am. Compl. ¶¶ 2–3 (emphasis added).) Moreover, paragraph 323 states that, "*Upon information and belief, the CVS Caremark Defendants continue to submit false or fraudulent claims to CMS in the very same manner as described herein.*" (Id. ¶ 323 (emphasis added).)[3]

---

[3] Plaintiff also cites to paragraph 143, which states that "Defendants, through subsidiary Part D sponsors and/or PBMs, have made such explicit certifications [of the accuracy and completeness] of PDE data from 2006 to the present. They continue to make these certifications on an ongoing basis to the Government." (Am. Compl. ¶ 143.) This paragraph, however, does not allege any ongoing fraudulent conduct by Defendants; rather it simply states that Defendants continue to submit certifications of PDE data—as they are required to do—to the government.

Such cursory allegations, made on information and belief alone, are unquestionably insufficient to open the door to broad and burdensome discovery into Defendant's nationwide practices over the course of more than seven years. The inadequacy of such allegations becomes abundantly obvious when considered in the context of the remainder of the document. The Amended Complaint extensively and repeatedly discusses the time period of *January 1, 2006 through January 2008*, during which time Defendants provided PBM services to MCS. (Id. ¶¶ 249–253.) It then goes on to state that "*[d]uring the time period relevant to this Complaint*, the Caremark Defendants regularly and knowingly submitted false or fraudulent PDE data items to CMS"—an implicit but evident suggestion that the "relevant time period" spans only from January 1, 2006 to January 1, 2008.[4] (Id. ¶ 323 (emphasis added).) The Amended Complaint later re-emphasizes that "[t]he Caremark Defendants fraudulently submitted or caused the submission of Part D claims data (PDE data) and other required payment data on behalf of MCS *from January l, 2006 and until 2008* to CMS . . . ." (Id. ¶ 337 (emphasis added).) Thereafter, when expressly pleading his nationwide claims, Plaintiff phrases them in past tense, with no contention that the conduct is continuing. (Id. ¶¶ 347–351.) This past tense description holds true throughout the entire portion of the Amended Complaint which sets forth the FCA cause of action against Defendants—at no point does Plaintiff use the language of a continuing violation.

---

[4] Plaintiff argues that the "relevant time period" referred in paragraph 323 is the continuing period from 2006 to the present. This interpretation, however, requires an illogical reading of ¶ 323. That whole paragraph reads: "[d]uring the time period relevant to this Complaint, the Caremark Defendants regularly and knowingly submitted false or fraudulent PDE data items to CMS. Upon information and belief, the CVS Caremark Defendants continue to submit false or fraudulent claims to CMS in the very same manner as described herein." (Id. ¶ 323.) If the "relevant time period" was truly meant to constitute the entire time from 2006 to the present, it would have been redundant for Plaintiff to add the second sentence to allege that the conduct was continuing to the present.

(Id. 352–380.)  Indeed, in the statement of the claim, Plaintiff contends that "[t]hese false claims were presented by the Caremark Defendants on behalf of thousands of separate entities, across the United States, and *over several years*"—language which conveys a finite period that does not continue to the present.  (Id. ¶ 378 (emphasis added).)  Ultimately, this Court recognized as much in the Memorandum Opinion denying Defendants' Motion to Dismiss.  In the face of Plaintiff's argument that the FERA amendments to the FCA should apply to this case, the Court noted that, "[t]he language of the retroactivity provision, however, is clear: it applies only to claims 'pending' on or afer June 7, 2008.  The Amended Complaint's cursory reference to 'continued' activity, made upon information and belief, (Am. Compl. ¶ 323), does not suffice to plead with specificity that Defendants had any false claims pending on or after this date.  Accordingly, the Court declines to apply the FERA amendments to this matter."  Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 170 n.30 (E.D. Pa. 2012).

Plaintiff's efforts to avoid the limitations established by his own pleading are unconvincing.  First, he argues that his company, Pharm/DUR, performed a subsequent audit in 2009 of another Part D Sponsor for which Defendants served as the PBM.  That audit, which reviewed claims submitted in 2007, exposed many of the same problems identified in the MCS audit, thus evidencing the continued nature of Defendants' activity.  (Pl.'s Mem. Supp. Mot. Compel 25.)  This argument, however, fails on two grounds.  First, Plaintiff cannot broaden the scope of his pleading by submission of this evidence.  The Amended Complaint is clearly confined to a 2006–2007 time period.  Evidence of purportedly continuing violations produced in conjunction with a motion to compel cannot amend Plaintiff's original allegations.  Moreover, even if this Court were to consider this evidence, Plaintiff concedes that the audit findings reflect

claims made in 2007—a year encompassed by the "relevant time period" defined in the Amended Complaint. As such, the 2009 audit findings will already be included in the discovery period and are not proof of any continuing violation past January 1, 2008.

Finally, Plaintiff appeals to the broad notion of justice as a basis for allowing temporally unlimited discovery. He argues that "if Defendants' position were accurate, a plaintiff would never be entitled to discovery beyond the bounds or time-frame of his own particular knowledge—even if the defendant continued his fraud well beyond the date of the filing of the action, and even if the defendants continued to engage in that very same fraud during the pendency of the litigation." (Pl.'s Mem. Supp. Mot. Compel 28.) Plaintiff, however, misunderstands the purpose of proper pleading. The simple inclusion of a cursory allegation that the Defendants' conduct is ongoing—made on information and belief only and without any of the specificity mandated by Federal Rule of Civil Procedure 9(b)— does not automatically entitle Plaintiff to obtain expansive discovery to the present of all of Defendants' practices in order to uncover new false claims. As aptly noted by a sister court facing a similarly broad FCA claim,

> The Plaintiff wants a ticket to the discovery process. If given such a ticket, the next stage of the next stage of this litigation is clear. The Plaintiff will request production of every lab test claim submitted by the Defendant over the last ten years. At that point, the Defendant may decide to settle the case to avoid the enormous cost of such discovery and the possible disruption of its ongoing business. On the other hand, the Defendant may choose to resist the discovery. In that case, the Court will be presented with the dilemma of allowing an unlimited fishing expedition or no discovery at all because of the difficulty in fashioning logical and principled limits on what has to be produced. The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernable boundaries and manageable discovery limits.

U.S. ex. rel. Clausen v. Lab. Corp. of Am., Inc., 198 F.R.D. 560, 564 (N.D. Ga. 2000), aff'd 290 F.3d 1301 (11th Cir. 2002), cert. denied, 537 U.S. 1105 (2003). Finding such reasoning

convincing, this Court declines to allow such a fishing expedition into potential fraudulent claims

beyond 2007 absent some particularized pleading that any such claims occurred.[5] Accordingly,

the Court limits the scope of discovery to the time period from January 1, 2006 to January 1,

2008.[6]

## B. Substantive Scope of Nationwide Discovery

In a second area of dispute, the parties disagree on the substantive scope of discovery on

---

[5] To the extent that Plaintiff asserts that Defendants' reliance on post-2007 documents—including CMS and HHS-OIG reports—opens the door to discovery post-2007, its contention is misplaced. These are publicly-available documents that were produced in support of Defendants' argument in its Motion to Dismiss that neither prescriber identifiers nor NDCs are conditions of payment—an argument that has been resolved by the Court. Such limited citations for a legal argument that is no longer at issue do not suddenly make all post-2007 discovery relevant to the present litigation.

[6] Plaintiff's cases cited in support of more expansive discovery on the basis of "continuing" violations are inapposite. Dart Drug Corp. v. Corning Glass Work, 480 F. Supp. 1091 (D. Md. 1979) merely held that "[d]iscovery as to materials produced after the filing of the complaint is proper where the materials are relevant to plaintiff's claims." Id. at 1107. Likewise, Carlson Cos., Inc. v. Sperry & Hutchinson Co., 374 F. Supp. 1080 (D. Minn. 1973), the court found that documents coming into existence after the filing of the complaint, which were relevant to the complaint's allegations of continuing violations, were discoverable. Id. at 1102. Both of those cases involved antitrust actions where material post-dating the complaint was obviously relevant to well-pled and plausible claims of continuing violations. In the present case, however, discovery regarding claims post-dating 2007 is not relevant to an Amended Complaint which makes only cursory and speculative references to conduct continuing to the present.
Plaintiff also cites to United States v. Torrance, 164 F.R.D. 493 (C.D. Cal 1995), which held that the plaintiff was entitled to discovery from defendant after the complaint was filed where the complaint alleged ongoing misconduct. That case, however, involved allegations of ongoing discriminatory conduct by defendant and a specific claim under a "continuing violations" theory. Id. at 495. Title VII employment discrimination claims "necessarily have been accorded a very broad scope of discovery." United States ex rel. Steward v. Louisiana Clinic, No. Civ.A.99-1767, 2003 WL 21283944, at *11 (E.D. La. June 14, 2003); see also Bryant v. Farmers Ins. Co., Inc., No. Civ.A.01-2390, 2002 WL 1796045, at *2 (D. Kan. July 31, 2002) (noting that an employer's general practices are relevant to the issue of the employer's discriminatory intent, even when a plaintiff is asserting an individual claim for disparate treatment).

the nationwide FCA claims. The Court's prior opinion recognized that Plaintiff pled that Defendants made false claims through six specific fraudulent practices inherent in its drug utilization review ("DUR") process. Spay, 913 F. Supp. 2d at 158. Further, the Court found that Plaintiff's cause of action for nationwide FCA violations withstood Rule 12(b)(6) scrutiny. Id. at 174–78. Plaintiff now contends that he may obtain broad, nationwide discovery on all six of the areas of fraud pled in the Amended Complaint. Defendants, on the other hand, counter that nationwide discovery should be limited to three areas only: (1) missing/push prescriber numbers; (2) expired/obsolete NDCs; and (3) gender contraindications.

The Court agrees with Defendants for several reasons. First, a thorough review of the Amended Complaint reveals that Plaintiff pled nationwide allegations only with respect to the three fraud areas identified by Defendants. When describing those three fraudulent practices, Plaintiff explicitly alleged that they were committed on a nationwide basis. (See Am. Compl. ¶ 288 ("CVS Caremark utilizes a nationwide adjudication system and has admitted that they intentionally make no effort to ensure that prescribers are identified or to deny claims for excluded or unlicensed providers, the total damage to the Federal Government from this knowing and intentional Part D fraud is extraordinarily significant. This is particularly true when considered in light of the fact that Caremark has been adjudicating and submitting Part D claims for thousands of other Plans, including Federal Government Plans."); ¶ 294 ("The Caremark Defendants have admitted that their nationwide system is intentionally designed not to conduct concurrent DUR for gender contraindications (will not deny claims based on drug-sex edits). The total damage to the Federal government from this knowing and intentional Part D fraud is extraordinarily significant, particularly when considered in light of the fact that

Caremark has been adjudicating and submitting Part D claims for thousands of other Plains, including Federal Government Plans."); ¶ 299 ("Defendants' intentional and knowing practice of paying claims for prescription drugs with expired or obsolete NDC numbers is not limited to the MCS contracts, but is common across the Caremark Defendants' entire nationwide network and affects all of Caremark's Medicare Part D pharmaceutical customers involved in Medicare Part D as Sponsors. The damage to the Federal government from Defendants' knowing, intentional, and fraudulent Part D non-compliance is therefore substantial.").) Subsequently, when setting forth the elements of the nationwide claims, Plaintiff included only these three practices in his allegations, as follow:

339. Caremark (now CVS Caremark) uniformly and systematically analyses, processes and documents all prescriptions managed by CVS Caremark using CVS Caremark's nationwide proprietary prescription management system.

340. CVS Caremark has admitted that its nationwide system does not conduct gender edits, check for false physician identifiers, or reject claims with expired NDCs.

341. The following Part D claims processing failures detected by Pharm/DUR involve company-wide or system-wide non-compliance with Part D requirements by the Caremark Defendants: fraudulent failure to conduct gender edits as part of Concurrent DUR and the adjudication of claims containing gender deviations; fraudulent failure to reject claims for false physician identifiers and submission of physician push numbers; the fraudulent failure to exclude expired drugs and the adjudication of claims with expired NDCs for three years past the inactive dates.

(Id. ¶¶ 339–41.)

In stark contrast to these explicit statements alleging that the foregoing practices were committed on a nationwide basis, the allegations with respect to the remaining three fraudulent practices at issue—non-application of MAC pricing, dispensing drugs without prior

10

authorization, and dispensing drugs over limits—neither contain mention of uniform occurrence on a nationwide basis nor suggest that any such practices occurred outside of the MCS contract. Indeed, with respect to each of these latter three practices, the Amended Complaint clearly and tellingly limits its allegations to fraudulent claims within the terms of the MCS contract in Puerto Rico. (See Am. Compl. ¶¶ 300–05 (describing, with respect to drugs dispensed without prior authorization, the losses resulting to CMS as a result of MCS's inflated bid and overpayments to CMS; no mention of any other potential false claims); ¶¶ 306–14 (describing, with respect to drugs dispensed over the approved limits, over-utilization that affected both the MCS bid and CMS's payments to MCS; no mention of other potential false claims); ¶¶ 315–18 (describing, with respect to improper MAC pricing, how this practice caused MCS's beneficiaries to pay higher co-pays and MCS to report higher Part D costs to CMS; no mention of other potential false claims).) Further, in the section of the Amended Complaint describing the basis for his nationwide claims, there is no indication that these practices are included. (Id. ¶¶ 339–41.) Rather, as explained above, the only practices on which Plaintiff rests his nationwide FCA claims are the gender edits, expired NDCs, and false/missing physician numbers.

Given these allegations, the Court clearly understood Plaintiff to be alleging nationwide fraud only with respect to Defendants practices of failing to conduct concurrent DUR for (1) gender indications; (2) missing/false physician numbers; and (3) expired NDCs. In the Opinion denying Defendants' Motion to Dismiss, the Court referenced the paragraphs dealing with these three practices and found that they adequately pled nationwide fraud. See Spay v. CVS Caremark. Corp., 913 F. Supp. 2d 125, 176–77 (E.D. Pa. 2012) (citing Am. Compl. ¶¶280 (prescriber numbers); 288 (prescriber numbers); 290 (gender indications); 299 (expired or

obsolete NDC numbers); 339–42 (all three practices)).[7]  Nothing in the Court's opinion was

intended to broaden the scope of Plaintiff's own pleading of his nationwide claim.[8]

In short, Plaintiff clearly and unequivocally limited his nationwide claims to the three

[7]  The only two paragraphs in which Plaintiff mentions other practices as potentially occurring on a nationwide basis are paragraphs 319 and 357.  Paragraph 319, which was cited by the Court in its Opinion, contains one sentence mentioning over-utilization as follows: "[t]he Caremark Defendants nationwide Part D claims adjudication system failed to have the required concurrent DUR, including gender contraindications and review for over-utilization."  (Am. Compl. ¶ 319.)  Paragraph 357 contains only one sentence mentioning lack of prior authorization, as follows: "[t]he CVS Caremark Defendants also intentionally and fraudulently failed to ensure that their nationwide claims adjudication system conducted required concurrent DUR (including gender contraindications), or prevented the submission of claims without prior authorization in keeping with the Part D Sponsor's Plan and formulary."  (Id. ¶ 357.)  These two sentences—viewed in light of (1) their sparse placement in the 382-paragraph Amended Complaint; (2) the detailed nationwide allegations for the three practices described above; and (3) the absence of any other allegations regarding nationwide failure to review for over-utilization or prior authorization, particularly in the section of the Amended Complaint that pleads the nationwide claims—simply do not suffice to satisfy Rule 9(b)'s specific pleading standard or to put either Defendants or the Court on notice that these allegations were part of Plaintiff's nationwide claims.

[8]  Plaintiff references footnote 33 of the Court's Opinion, wherein the Court discussed Plaintiff's allegations that CMS improperly paid retiree drugs subsidies to Defendants' other Part D customers, including the Federal Employee Health Benefits Program.  The Opinion stated that

> [B]ecause Plaintiff has not pled any specific false claims relating to RDS payments, Plaintiff is hard-pressed to pursue a nationwide claim on these RDS payments. . . . Nonetheless, the Court is not clear wither Plaintiff raises such allegations as mere examples of nationwide fraud by Defendants or as a separate basis for FCA liability. To the extent these allegations are merely part of Plaintiff's overall "nationwide" FCA claim and the Court has already found that the nationwide claim survives Rule 12(b)(6) scrutiny, the Court rejects Defendants' arguments.

Spay, 913 F. Supp. 2d at 177 n.33.  Plaintiff contends that, given this sentence, "[p]lainly the Court did not distinguish which of Relator's various claims were nationwide, but included all of Relator's various allegations within his nationwide FCA claim."  (Pl.'s Reply Br. 3 n.5.)  This interpretation is mistaken.  The Court—having been given no explanation of the regulatory structure of RDS payments—simply meant that to the extent Plaintiff was showing that the three specifically alleged nationwide fraudulent practices were also being committed in the context of RDS payments, such allegations were further exemplary of Defendants' nationwide fraud.

practices set forth above.  Although Plaintiff was free to plead with requisite Rule 9(b) specificity that the other practices at issue—failure to review for over-utilization, failure to ensure prior authorizations, and failure to apply negotiated MAC pricing—were committed on a nationwide basis, he neglected to do so.  Both Defendants and this Court thus understood the nationwide claims to be cabined to only three areas.  Plaintiff cannot now, in an effort to engage in unbridled discovery, unilaterally expand the scope of his Amended Complaint.  As such, the Court restricts the scope of nationwide discovery to Defendants' DUR practices in the areas of gender indications, expired NDCs, and missing/false physician push numbers.[9]

### C.     Geographic Scope of Nationwide Discovery

In a third point of contention, the parties dispute the appropriate geographic scope of the nationwide discovery.  Via their discovery responses, Defendants refused to produce any documents beyond those involving the MCS contract based in Puerto Rico.  Plaintiff now contends that the Court has allowed the nationwide claims to proceed, meaning that discovery outside those bounds is appropriate and necessary.

Defendants' refusal to produce documents rests on the assumption that this Court only allowed discovery into their "generalized practices" that "have caused Defendants to make multiple false claims at its various pharmacies nationwide."  (Defs.' Opp'n Mot. Compel 4–5 (quoting Spay, 913 F. Supp. 2d at 178 n.34)).  Defendants goes on to argue that because the Amended Complaint's nationwide allegations focus on "specific fraudulent practices" as opposed to "particular fraudulent claims," only some non-burdensome discovery into the "scope"

---

[9] Notably, Plaintiff remains entitled to discovery with respect to all six areas of fraud as they relate to the MCS contract.

of those practices is allowed to proceed.  (Id. (quoting Spay, 913 F. Supp. 2d at 175 n.32).)

This argument, however, relies on a skewed interpretation of the Court's opinion.

Specifically, when determining that Plaintiff's nationwide claims could proceed, we held:

> Taking these well-pled allegations as true, the Court finds a strong inference that Defendants submitted false claims nationwide.  Indeed, the sheer number of claims identified by Plaintiff in at least three states and Puerto Rico suggests, without need for speculation, that Defendants' reporting practices likely occurred at Defendants' other facilities throughout the country.  ***Certainly, Plaintiff cannot be expected to plead with particularity each and every false claim nationwide without the benefit of at least some discovery, as such information rests solely within Defendants' control.***  In turn, such allegations are sufficient to allege, at this stage of the litigation, a nationwide False Claims Act under Rule 9(b).  The Court therefore declines to dismiss this claim.

Spay, 913 F. Supp. 2d at 178 (emphasis added) (footnote omitted).  This ruling makes clear that not only could Plaintiff take discovery on the specific false claims occurring in the context of Defendants' contract with MCS, but he could also pursue discovery to determine the extent to which Defendants' alleged fraudulent claims process carried over into other contracts with other Part D sponsors.  See United States ex rel. Fry v. Guidant Corp., No. Civ.A.03-0842, 2007 WL 4255275, at *2 (M.D. Tenn. Nov. 30, 2007) ("[T]he Second Amended Complaint asserts claims nationwide, and . . . until these claims are dismissed or otherwise limited they are appropriate subjects of discovery pursuant to Rules 26 and 24.").  While the Court made several references to the fact that Plaintiff's nationwide claims did not focus on particular fraudulent claims, but rather "specific fraudulent practices, which . . were carried out with respect to Defendants' contracts with other Part D Sponsors other than MCS," Spay, 913 F. Supp. 2d at 175 n.32, these observations were made in efforts to distinguish cases cited by Defendants wherein the plaintiffs sought to expand discovery on the basis of a few discrete false claims and the speculative

assumption that the defendant was likely to have made similar false claims. The Memorandum went on to note that, because Plaintiff had aptly identified hundreds of specific false claims occurring within a specific contract and then defined various company-wide practices that were part of Defendants' nationwide claims-processing services, Plaintiff had avoided the pitfall of speculation that was fatal to nationwide claims in other cases. Id. at 178. Nothing in the decision supports Defendants' position that discovery in the nationwide allegations was limited to the "scope" of specific fraudulent practices or to only the MCS contract.

This finding, however, leaves the Court with somewhat of an unwelcome conundrum. On one hand, Plaintiff has clearly satisfied Rule 9(b)'s pleading of a nationwide claim sufficient to entitle it to enough discovery to prove that claim. Such discovery would then allow Plaintiff to fully expose the scope of any fraudulent scheme by Defendants. One the other hand, the Court remains mindful of the fact that Defendants are national companies that have acted as PBMs for over thirty Part D Plan sponsors nationwide, covering millions of lives and processing millions of prescription claims. The cost of discovery in this case could be so prohibitive as to force Defendants into a settlement based not on any assessment of the merits of the case against it, but simply to avoid the undue burden associated with what could potentially be a mere fishing expedition. Such a result is not desirable and does not satisfy the ends of justice.

We find useful guidance from sister courts in other jurisdictions. In similar situations, where nationwide discovery would be either overbearing or cost-prohibitive, some courts have provided an initial period of limited discovery to regions in which specific false claims had been alleged, while reserving for a later date broader nationwide discovery on claims that were supported only by reasonable inferences drawn from the allegations of the complaint. See, e.g.,

United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 719 F.3d 31, 37–40 (1st Cir. 2013) (approving of district court's limiting plaintiff's initial discovery to the region in which the plaintiff had "direct experience," despite noting that the district court had found "a strong inference that such claims were also filed nationwide."); United States ex rel. Carpenter v. Abbott Labs., Inc., 723 F. Supp. 2d 395, 409–10 (D. Mass. 2010) (noting that although a nationwide scheme had been sufficiently pled, the "sensible course" was to limit the initial discovery to the single representative state used to set forth the basis for the nationwide claims); United States ex rel. Rost v. Pfizer, Inc., 253 F.R.D. 11, 17 (D. Mass. 2008) (holding that although plaintiff adequately alleged nationwide false claims based on representative claims made in Indiana, the court would permit discovery only relating to the sales and marketing region that included Indiana; "[i]f the discovery shows that kickbacks were paid to the doctors who then made off-label prescriptions, and that this sales region was following national directives, the Court will expand the scope of discovery nationwide").

Given the ample logic underlying these cases, the Court will adopt a similar approach. With respect to the three nationwide practices at issue, Plaintiff has put forth examples of false claims, based on his personal knowledge, in Puerto Rico, New York, Ohio, Pennsylvania, Illinois, and Florida. (Am. Compl., Ex. C.) As such, Plaintiff shall be permitted to pursue discovery on its nationwide claims in those six jurisdictions. Should such discovery reveal that the three alleged nationwide fraudulent practices of Defendants were carried out regularly on contracts based in those states, Plaintiff shall have the opportunity to file an appropriate motion

requesting broader nationwide discovery.[10]  Such an approach will achieve the dual purposes of

protecting Defendants from unduly burdensome and potentially unnecessary discovery while

allowing Plaintiff to test the waters of his nationwide claim with the opportunity for broadening

its scope should its allegations ring true.

### D.    Defendants' Objections to Specific Discovery Requests

Plaintiff's Motion to Compel next seeks an order overruling Defendants' objections to

specific Requests for which Defendants refused to produce any documents.  The Court separately

addresses each of the six categories at issue.

### 1.    Contracts Between Defendants and Downstream Entities

First, via Request Nos. 12, 13, 15, and 16, Plaintiff seeks information regarding

Defendants' contracts with the Part D Plans and/or any downstream entities (including

dispensing pharmacies), which are directly involved in the claims alleged to be false in this case.

Plaintiff contends that such requests are relevant to (1) identifying the Part D Plans for which

Defendants submitted false PDE claims to the Government; (2) identifying the downstream

entities that dispense the prescription and sent data regarding that prescription to Defendants; (3)

proving that Defendants agreed to perform "concurrent DUR" and "data edit and quality control

procedures designed to ensure accurate and complete prescription data"; (4) proving that

Defendants had significant financial incentives for adjudicating claims and dispensing Part D

drugs; (5) proving that Defendants agreed that their activities must be consistent with and comply

---

[10]  This limitation shall not be construed to restrict Plaintiff's ability to obtain discovery regarding false claims related to the Defendants' provision of PBM services to MCS regardless of the location of where the conduct occurred.  Defendants have already agreed to such production.  (Defs.' Opp'n Mot. Compel 11 n.3.)

with the Part D Sponsor's contractual obligations to CMS; and (6) proving that Defendants' contracts with Part D Plan sponsors specifically provided for MAC pricing on certain Part D drugs.

Defendants object to these Requests on the ground that they are overbroad and seek documents that have no relevance to the allegations in the Complaint. They contend that such Requests would encompass all of Defendants' contracts with pharmacies participating in Defendants' Part D network, a group that numbers over 50,000 pharmacies annually. To the extent such information is relevant to identify the downstream entities, Defendants claim that there are less burdensome ways to do so.

Given the foregoing limitations that have now been placed on discovery, the Court does not deem these Requests overly broad or unduly burdensome. Moreover, the Court recognizes that these Requests are relevant to allow Plaintiff to not only identify the appropriate Part D Plans and downstream entities with which Defendants contracted, but also to determine the extent to which the contracts with such entities were similar to the contract with MCS and the downstream entities participating in that contract. Moreover, as noted by Plaintiff, this information is relevant to Defendants' Nineteenth Affirmative Defense that third parties are responsible for the damages alleged by Plaintiff. Accordingly, the Court will compel Defendants to respond to these Requests within the geographic, temporal, and substantive bounds set forth above.

**2.      Bids and Proposals Related to the Part D Program that Defendants Submitted to the Government**

Request Nos. 14 and 32 seek any and all documents related to any bids, proposals,

quarterly-yearly reports, applications, or plan specifications submitted by Defendants to the Government. Plaintiff contends that such documents are relevant to proving the content of the representations that Defendants submitted to the United States about the costs of the Part D services at issue in this case, establishing Defendants' scienter regarding Plaintiff's central allegations—including whether Defendants submitted and received payment for services they did not provide, and proving damages. Defendants object that, although such information would relate to Part D Plan sponsors, none of the named Defendants are Part D Plan sponsors and, thus, have not submitted any bids or proposals related to Part D to the government. Moreover, the Amended Complaint contains no specific factual allegations that Defendants ever submitted false PDE data in their role as a Part D Plan sponsor.

At this juncture, the Court must agree with Defendants. The Amended Complaint challenges Defendants actions "in their role as a Pharmacy Benefit Manager." (Am. Compl. ¶ 2.) Further, all of the false claims that Plaintiff has pled with specificity involve the Defendants' actions as PBMs, not as Part D Sponsors. The only entity identified as a Part D Sponsor is SilverScript Insurance Company, which is a wholly-owned subsidiary of CVS Caremark Corp., but not a named Defendant. Even with respect to that entity, however, Plaintiff has pled no specific false claims. Plaintiff's argument that the Amended Complaint seeks recovery from Defendants, including their subsidiaries, for their conduct as Part D Sponsors is unavailing. The burden falls on Plaintiff to identify and name the relevant entities and to make specific allegations of false claims submitted by such entities as Part D Sponsors. As Plaintiff has failed to do so, discovery on this issue is not relevant.

### 3. Documents and Communications Regarding Edits to Caremark's Nationwide Part D Claims Adjudication System

Plaintiff's Motion also seeks to compel documents and communications regarding edits to Caremark's nationwide Part D claims adjudication system. (Pl.'s Mem. Supp. Mot. Compel 31.) Request No. 18 specifically seeks "all documents, including internal and external communications, relating to edits or changes created, considered and/or implemented by CVS/Caremark for all CVS/Caremark Part D Plans for which CVS/Caremark was contracted to provide PBM services . . ." (Pl.'s Mot. Compel, Ex. C, Request No. 18.) Defendants objected on boilerplate grounds. Plaintiff now contends that its Amended Complaint asserts that Defendants' nationwide claims adjudication system failed to have required edits in place to reject false PDE claims, including claims without valid prescriber identifiers and claims for gender specific drugs prescribed to the opposite gender—an allegation which this Court upheld. (Am. Compl. 319–22.) He thus reasons that documents and communications relating to the edits Defendants had in place or considered implementing to identify and reject invalid claims are clearly relevant to proving that Defendants knowingly submitted false PDE claims on a nationwide basis.

Defendants do not respond to this argument or provide any basis for why such information should not be produced. Because the Court finds that such information could reasonably lead to admissible evidence regarding the claims at issue in this case, Defendants shall be required to respond to this document request.

### 4. Defendants' Compliance Plans, Policies, and Procedures for the Part D Program

Request Nos. 30, 31, and 38 seek documents with respect to Defendants' compliance

program, policies, and procedures regarding the Part D Program. Plaintiff contends that such requests will show whether Defendants complied with their own procedures in submitting false claims to the government or showing whether Defendants properly retained documents according to its own document retention policies. All of this information, in turn, will establish scienter and whether they "knowingly" submitted false claims, which is an element under the FCA. Defendants, however, object on the simple ground that such documents are not likely to lead to the discovery of any admissible evidence.

The Court disagrees with Defendants. Compliance information, particularly within the temporal bounds established in this Opinion, certainly could lead to the discovery of admissible evidence regarding Defendants' scienter. Accordingly, the Court will compel production of documents responsive to these requests.

### 5. Documents and Communications Regarding Audits Relating to Defendants' Activities in the Part D Program, Including Those Performed by Defendants' Other Part D Plan Sponsor Clients and the United States Government

Plaintiff's next set of Requests involves all documents and communications regarding audits relating to Defendants' activities in the Part D Program, including those performed by Defendants' other Part D Plan Sponsor clients and the United States Government. These documents are encompassed by Request Nos. 22, 23, 24, 33, 41, 53, and 59. Plaintiff now argues that these are relevant to proving (a) that Defendants submitted false PDE claims on a nationwide basis; (b) Defendants understood the requirements of the Part D Program; and (c) Defendants knowingly submitted false PDE claims to the government. Defendants object on the grounds that such Requests are nothing more than a fishing expedition for new claims upon which Plaintiff

can bring suit.

To the extent that such audits will encompass claims within the temporal scope previously dictated (2006–2007), these requests are entirely relevant. Such requests could establish Defendants' non-compliance with their contractual obligations, as well as their scienter in knowingly submitting false claims. To that end, the 2009 Pharm/DUR audit of another Part D Sponsor for which Defendants served as the PBM—which reviewed claims submitted in 2007—would fall within the defined temporal bounds. Purported audits by the United States Government in 2010 and 2012, however, would not be discoverable unless they involved claims occurring in 2006 and/or 2007. Accordingly, the Court will order production of documents responsive to this Request to the extent such documents fall within the defined temporal and geographic scope of discovery.

**6. Documents Related to Defendants' Efforts to Comply with State Pharmacy Codes and Regulations Regarding the Specific Areas of Fraud at Issue in this Case**

The last of the specific subject areas at issue in this Motion involves documents regarding Defendants' efforts to comply with State Pharmacy Codes and Regulations regarding: (1) expired, terminated, or obsolete drugs; (2) gender specific contraindications for prescription drugs; (3) obtaining prescriber identification for prescription drugs; and (4) prior authorizations for prescription drugs (Request Nos. 55, 56, 57, and 58). Defendants, however, refuse to produce these documents on the basis that Plaintiff fails to articulate how these documents are relevant to his claim that Defendants violated federal law.

The Amended Complaint makes the relevance of these Requests abundantly clear. It alleges that "[i]n addition to meeting the Medicaid statute's definition of 'prescribed drug,'

covered Part D drugs must be dispensed in accordance with State pharmacy laws and regulations. 42 C.F.R. § 423.505(i)(4)(iv) (requiring compliance "with Federal laws, Regulations, and CMS instructions); 42 C.F.R. § 404.504(b)(iv)(A) (requiring compliance with applicable Federal and state standards); 42 C.F.R. § 423.153(c)(1) (Sponsors must represent that network providers are required to comply with state pharmacy standards)." (Am. Compl. ¶ 176.) It goes on to assert that the Defendants, as network providers for Part D Plan Sponsors, were required to comply with CMS Part D laws and "all regulations mandating adherence to state pharmacy laws." (Id. ¶ 177.) Thus, to the extent that Defendants did not comply with applicable State Pharmacy Codes, they may have violated their contractual obligations and caused the submission of false claims to the government. Because the requested discovery goes directly to that issue, Plaintiff shall be entitled to such documents, subject again to the temporal, geographic, and substantive bounds set forth above.

### E.  Defendants' Confidentiality Objections

Plaintiff's Motion next challenges Defendants' objections that the information sought is purportedly "confidential and proprietary" and/or on the basis that the information "may be subject to confidentiality agreements with third parties." In response, however, Defendants clarify that they do not object to production of documents containing their own confidential information and emphasize that they will produce such materials pursuant to the Protective Order that has been entered in this case. They further explain that their objection relates only to documents that may be protected by confidentiality agreements between Defendants and third parties and that cannot be unilaterally waived. They have already communicated to Plaintiff that if they encounter responsive documents that are subject to third-party confidentiality agreements,

they will "work in good faith to resolve the issue with the third party such that production may be made." (Defs.' Opp'n Mot. Compel 21.) For all practical purposes, however, Defendants represent that they are not at this time withholding any documents on the basis of third-party confidentiality agreements and believe the situation is unlikely. Should such a situation arise, and should Defendants be unable to resolve the issue with the third-party, Defendants suggest that they will raise the matter with Plaintiff's counsel and, if necessary the Court.

In light of the fact that no documents are being withheld at this time on the grounds of confidentiality agreements with third parties, any ruling on the propriety of this objection is premature. Should a situation arise where a responsive document is subject to and withheld on the basis of a third-party confidentiality order, Plaintiff may re-raise this issue via a proper motion filed with the Court.

### F.    Objections Based on Basic Industry Terms

Finally, Plaintiff contends that Defendants' Responses are full of objections to basic industry terms, including many which were extensively discussed in this Court's opinion on the Motion to Dismiss. Plaintiff asserts that "[i]t is disingenuous for Defendants to feign misunderstanding of these basic industry terms, while at the same [time] acknowledging that they are the largest provider of prescription and related healthcare services in the United States, and that their subsidiaries fill or manage more than one billion prescriptions per year." (Pl.'s Mem. Supp. Mot. Compel 35.)

Defendants, however, explain that their objections to definitions are lodged only to the extent that the definitions are purportedly inconsistent with controlling law and/or Medicare Part D rules, regulations, or guidance. Further, Defendants' counsel has expressly represented to

Plaintiff's counsel that they have not and would not withhold any body of documents on the basis of these objections.

Given this representation, the Court sees no need, at this juncture, to overrule Defendants' objections.  Should a situation arise where documents are withheld on the basis of these objections, Plaintiff may re-raise this issue through a properly-file motion to compel.

## III.    CONCLUSION

While this Court is not in the habit of writing extensively on discovery disputes, the broad scope of discovery sought in a case of this magnitude requires some explanation of how future discovery should proceed.  An Order consistent with the foregoing rulings shall be entered and the parties should engage in their best efforts to abide by both its letter and spirit.